UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
KISSHIA SIMMONS-GRANT,

        Plaintiff,

    -v-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP,

        Defendant.

------------------------------------------------------x



No.  11 Civ. 7706 (LTS)

**O**PINION AND **O**RDER

A**PPEARANCES**:

LIDDLE & ROBINSON, LLP
  By: James William Halter
800 Third Avenue, 8th Floor
New York, NY 10022

*Counsel for Plaintiff*

PROSKAUER ROSE LLP (Newark)
    By: Lawrence Roy Sandak
        Tashia Millstein
One Newark Center
Newark, NJ 07102

*Counsel for Defendant*

L**AURA** T**AYLOR** S**WAIN**, U**NITED** S**TATES**
D**ISTRICT** J**UDGE**

SWAIN, U.S.D.J.

Kisshia Simmons-Grant ("Plaintiff") brings this action against her former employer, the law firm Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn" or "Defendant"), asserting claims for race discrimination and retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981a; the New York State Human Rights Law, N.Y. Exec. Law § 296; and the New York City Human Rights Law, N.Y.C. Admin Code § 8-107 et seq. The gravamen of Plaintiff's discrimination claim is that, as an African American contract attorney, she was assigned less lucrative work than other non-African American contract attorneys retained by Quinn. The Court has jurisdiction of this matter pursuant to 42 U.S.C. § 2000e-5f and 28 U.S.C. §§ 1331 and 1367.

Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court has carefully considered all of the parties' submissions, and for the following reasons, Defendant's motion is granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Plaintiff, an African American woman, was employed as an hourly contract staff attorney by the Defendant law firm from November 2006 until her resignation on August 5, 2010. (Def's 56.1 St.[1] ¶¶ 6, 7, 178.) When Plaintiff worked at Quinn, contract attorneys were paid by the hour, and were only paid

---

[1]     Citations to the parties' S.D.N.Y. Local Civil Rule 56.1 Statements incorporate by reference the evidence cited in those Statements.

for hours actually worked. (Id. ¶ 13.)  Todd Riegler ("Riegler") became the Senior Discovery

Attorney and the New York contract attorney coordinator at Quinn on September 1, 2009, which

meant that he was responsible for managing the pool of contract attorneys and assessing who

was available to work on cases. (Id. ¶¶ 25, 28.)  Associates and contract attorneys at Quinn

could, however, correspond directly with each other about working on discovery projects, rather

than going through Riegler. (Id. ¶ 17.)  Prior to September 2009, Riegler was involved in

managing and staffing two projects. (Id. ¶ 26.)  Plaintiff admits that she was personally satisfied

with the overall number of hours that she worked in 2009, although she asserts that these hours

were still less than those of non-African American attorneys. (Pl's 56.1 St. ¶¶ 31-34.)

        On November 10, 2009, while Plaintiff was working on a document review

project for Ambac, a Quinn client, Riegler sent an email to Plaintiff to ask whether she was

"willing" to switch to Morgan Stanley/Safeguard, which was a "very large" project "with

[overtime] approval," and Plaintiff agreed to switch. (Def's 56.1 St. ¶¶ 48-49.)  Another African

American attorney was also asked to switch to the Morgan Stanley project, while two Caucasian

attorneys who, in Plaintiff's opinion, were "unqualified" to work on the Ambac project, were not

asked to switch. (Id. ¶¶ 54, 61-64.)  The Caucasian attorneys remained on the Ambac project

because they were assigned to do second-level review and privilege review for that project,

while Plaintiff had been assigned to do first-level review. (Id. ¶ 61.)  Plaintiff admits that it was

generally a matter of individual opinion as to which review assignment was preferable. (Id. ¶

43.)  Several other African American attorneys also remained on the Ambac project. (Id. ¶¶ 57-

58.)

        In December 2009, after Plaintiff began work on the Morgan Stanley project as a

first-level reviewer, the client unexpectedly decided not to use Quinn's contract attorneys for

first-level review, leaving Plaintiff and at least eight other attorneys without work. (Id. ¶¶ 71-
72.) Two Caucasian attorneys were assigned to work on a project for another client, Rabobank,
in January 2010, to which Plaintiff was not assigned. (Pl's 56.1 St. ¶ 69). Plaintiff was assigned
to a document review project for United Guaranty in January 2010; however, the delayed arrival
of the documents for that project meant that review could not commence until February 2010,
and so Plaintiff was assigned back to the Ambac project until the United Guaranty review began.
(Def's 56.1 St. ¶¶ 76, 78-81.) Plaintiff billed 70 hours in December 2009, and 48 hours in
January 2010. (Id. ¶ 74).

On February 11, 2010, Plaintiff requested a meeting with Peter Calamari, the
managing partner of Quinn's New York office, to "discuss the system by which contract
attorneys receive work." (Id. ¶¶ 89-90.) At the resultant meeting on February 12, 2010, Plaintiff
complained that Riegler was distributing work based on favoritism, and that white attorneys
received more assignments than the rest of the attorneys. (Id. ¶¶ 91-92, 94, 98.) After the
meeting, Calamari spoke with Riegler about Plaintiff's concerns. (Id. ¶¶ 105-107.) Calamari
asserts that he did not identify Plaintiff as the complainant. (Id. ¶¶ 108-109, 104.) Calamari
asked Riegler to send him data regarding past work assignments, and how assignments were
issued; Riegler did so on February 21, 2010. (Id. ¶¶ 110-13.) Calamari also notified Quinn's
director of human resources, Debbie Klaeger, and Eric Emanuel, who acted as the firm's General
Counsel, that Plaintiff had made a complaint of discrimination. (Id. ¶¶ 102-03.) Calamari
reviewed the information provided by Riegler, which did not include information on the
attorneys' races, and concluded that there was nothing suspicious about Plaintiff having lower
hours in December 2009 and January 2010. (Id. ¶¶ 117-19.) Calamari emailed Plaintiff on
February 26, 2010, with these findings, and asked her to report any other assignment that she felt

was unfair.  (Id. ¶ 123.)  Plaintiff replied on March 2, 2010, saying that she would go through her notes for past incidents, but never followed up with further information.  (Id.  ¶¶ 124-25.)

Plaintiff had a supervisory role, which she shared with two other Quinn contract attorneys, on the United Guaranty project.  (Id. ¶ 130.)  Plaintiff set up a supervisory shift schedule.  (Id. ¶ 134.)  Alex Jennison, a co-worker, was unhappy with the schedule, and he discussed this with Plaintiff for a brief period of time on July 14, 2010, as well as corresponding with her by email that week.  (Id. ¶ 135; Pl's 56.1 St. ¶¶ 137, 139.)  According to Plaintiff, Jennison approached her "in her face" and "in an aggressive manner," and was "shaking and angry" during their face-to-face discussion on July 14, 2010, and she alleges that she left the area because she was afraid that Jennison might touch her.  (Pl's 56.1 St. ¶ 135.)  Plaintiff alleges that, during this encounter with Jennison, she felt fearful and uncomfortable.  (Id. ¶ 135.)  Jennison denies raising his voice during this discussion.  (Def's 56.1 St. ¶ 136)  On July 20, 2010, Plaintiff sent an email to Riegler requesting that either she or Jennison be moved off the United Guaranty case.  (Id. ¶ 137.)  In this email, Plaintiff detailed the July 14, 2010, conversation, and also discussed complaints that she indicated she had heard from the offsite attorneys regarding Jennison's hostile conduct.  (Id.)  Jennison admits to having once banged on another attorney's desk because the attorney was asleep, but denies that he was upset while doing so.  (Jennison Dep. at 124:22-126:16.)  Plaintiff's July 20, 2010, email concluded that Jennison's actions "create a hostile work environment in which I refuse to continue to work."  (Def's 56.1 St. ¶ 137.)  Riegler responded that he would look into the matter, and Plaintiff advised him that she would leave her next shift early so as not to run into Jennison.  (Id. ¶¶ 140-41.)

Riegler and the New York office manager, Rebecca Fogler, held meetings with

Jennison, Osborne and Plaintiff on July 21, 2010. (Id. ¶ 143.)  When Plaintiff met with Riegler

and Fogler, she explained that she felt afraid because it seemed that Jennison was angry with her

during their conversation on July 14, 2010. (Id. ¶¶ 146-47.)  However, there was no evidence of

complaints about Jennison's conduct from anyone other than Plaintiff.  Riegler explained that

there were no projects to which Plaintiff could be transferred at that point, and refused to

reassign her.[2] (Id. ¶ 151.)  Quinn asserts that Riegler and Fogler made three suggestions to

alleviate the tension: (1) that Riegler would assign the shift schedule going forward; (2) that all

communications between Plaintiff and Jennison would go through Riegler; and (3) that a twenty-

minute buffer would be created between Plaintiff's and Jennison's shifts in order to avoid a

confrontation. (Id. ¶ 150.)  Plaintiff maintains that only the first solution, namely, Riegler taking

over the scheduling, was discussed on July 21, 2010, and that the other solutions were discussed

at a subsequent meeting on July 23, 2010. (Pl's 56.1 St. ¶ 150.)  Plaintiff's deposition testimony

reflects all three solutions being discussed on July 21, 2010. (Simmons-Grant Dep. at 206:16-

208:11.)  Furthermore, an email sent to Plaintiff by Fogler on July 22, 2010, refers to "creating

the schedule so you did not need to see one another at the off-site." (Halter Decl., Ex. 26.)  Four

hours after the July 21, 2010, meeting, after an allegedly hostile encounter with Jennison in an

elevator, Plaintiff sent an email to Riegler and Fogler notifying them of her resignation, effective

on August 5, 2010. (Pl's 56.1 St. ¶¶ 157-58.)  During Plaintiff's last two weeks of work, she

worked on the United Guaranty matter and some smaller, short-term projects. (Id. ¶¶ 163, 172-

---

[2]     When the supervising associate on the United Guaranty learned of the conflict
       between the Plaintiff and Jennison, his "first choice [was] to have Alex [Jennison]
       stay on the project." (Halter Decl., Ex. 24.)  Riegler explained to the associate that all
       of the contract attorneys in the New York officer were "currently . . . assigned to time-
       sensitive projects requesting up to 60 hours per week," meaning that no one would be
       available to replace Plaintiff or Jennison in the event that either of them was
       transferred from the United Guaranty project. (Id.)

73.)

To support her claims of race-based discrimination, Plaintiff proffers statistical evidence showing that, for the year of 2009, full-time African American contract attorneys billed an average of about 230 fewer hours when compared with all other full-time contract attorneys at Quinn. (Pl's 56.1 St. ¶ 185; Pl. Mem. at 1-2.) The five highest billing attorneys on the 2009 list were two Caucasian attorneys and three Asian attorneys. (Id.) This evidence covers a period of eight months before Riegler was promoted, and four months thereafter. Plaintiff proffers similar evidence for the period from January 1, 2010, to August 5, 2010, showing that, as a group, African American contract attorneys billed an average of 80.9 fewer hours than the rest of the Quinn contract attorneys. (Pl's 56.1 St. ¶¶ 179-180.) The top five billing attorneys on this 2010 list consist of one Caucasian attorney, three Asian attorneys, and one African American attorney. (Id.) Both sets of figures compare African American attorneys with all other attorneys, rather than comparing Caucasian attorneys with all other attorneys. (Id.)


## DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (the moving party bears the burden of establishing that there is no genuine issue of material fact). A fact is considered "material "if it might affect the outcome of the suit under the governing law," and an issue of fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (internal quotations and citations

omitted).  The Second Circuit has explained that "[t]he party against whom summary judgment

is sought . . . 'must do more than simply show that there is some metaphysical doubt as to the

material facts . . . [T]he nonmoving party must come forward with specific facts showing that

there is a genuine issue for trial.'"  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002)

(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

Similarly, "mere conclusory allegations, speculation or conjecture" will not suffice to defeat

summary judgment.  Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).


Plaintiff's Title VII Discrimination Claim

        Plaintiff's Title VII claim of discrimination is properly analyzed under the three-

part burden-shifting test established by the Supreme Court in McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973).  A plaintiff must first proffer a prima facie case; if she does so, the

burden then falls on the defendant to articulate a legitimate, non-discriminatory reason for its

actions.  Id. at 802.  If the defendant meets this burden, the plaintiff must then show that the

stated reason was merely a pretext for discrimination.  Id. at 804.  The plaintiff "at all times

bears the ultimate burden of persuasion."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511

(1993) (internal quotations and citation omitted).

        In order to establish a prima facie case, Plaintiff must show that: "(1) she is a

member of a protected group; (2) she was qualified for the position; (3) she experienced an

adverse employment action; and (4) that [the adverse] action occurred under circumstances

giving rise to an inference of discrimination."  Dixon v. Int'l Fed'n of Accountants, 416 F. App'x

107, 109 (2d Cir. 2011) (citing Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 107 (2d Cir.

2010)).  Here, Plaintiff meets the first two criteria: she is African American, and is admitted to

practice law in the State of New York.  The third and fourth prongs of Plaintiff's prima facie case

are, however, disputed.

          Materially adverse employment actions, "such as termination, failure to promote,

denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination . . .

constitutes a separate actionable unlawful employment practice."  Nat'l R.R. Passenger Corp. v.

Morgan, 536 U.S. 101, 114 (2002).  In Morgan, the Supreme Court characterized an actionable

adverse employment action as a "discrete" harm which occurs at one particular time, as

contrasted with the ongoing harm of a hostile work environment.  Id.  An employee suffers an

adverse employment action if he or she "endures a materially adverse change in the terms and

conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of

job responsibilities."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)

(citations and internal quotation marks omitted).  Some examples of materially adverse

employment actions include the "termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices . . . unique to a particular situation."

Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (citations and internal quotation marks

omitted).  "While adverse employment actions extend beyond readily quantifiable losses, not

everything that makes an employee unhappy is an actionable adverse action."  Pimentel v. City of

New York, No. 00 Civ. 326(SAS), 2002 WL 977535 at *3 (S.D.N.Y. May 14, 2002) (internal

quotations and citations omitted), aff'd, 74 F. App'x 146 (2d Cir. 2003).

          A lateral transfer does not generally constitute an adverse employment action for

Title VII purposes.  To be "materially adverse," the action must "result[ ] in a change in

responsibilities so significant as to constitute a setback to the plaintiff's career." <u>Galabya</u>, 202

F.3d at 641 (internal citations omitted) (holding that a teacher's transfer from a special needs

school to a regular school did not constitute an adverse employment action). "[S]ubjective

dissatisfaction with assignments does not constitute adverse employment action." <u>Brown v.</u>

<u>Snow</u>, No. 02 Civ. 7985(GEL), 2006 WL 623594 at *5 (S.D.N.Y. Mar. 13, 2006), <u>aff'd</u> <u>sub</u> <u>nom.</u>

<u>Brown v. Paulson</u>, 236 F. App'x 654 (2d Cir. 2007) (internal citation omitted).

      Plaintiff characterizes her transfer from the Ambac case to the Morgan Stanley

case in November 2009 as an adverse employment action, because those who remained on the

Ambac case billed higher hours than she did after her transfer.  Plaintiff alleges that she lost

hours when Morgan Stanley decided that it would no longer employ Quinn attorneys for first-

level review.  Plaintiff does not dispute that the decision that resulted in her loss of income was

made solely by the client, nor does she dispute Quinn's representation as to the timing of that

client decision (<u>i.e.</u>, after her transfer).  Rather, she asserts that, because Morgan Stanley

continued to use Quinn attorneys to do second-level and privilege review and Riegler had

recommended that Plaintiff only be allowed to do first-level review on the case, the initial

transfer constituted an adverse employment action.  Plaintiff admits that first-level review is not

inherently better or worse than second-level or privilege review; an attorney may prefer to do one

type of review over another.  Because "an employee's preference for one assignment over

another is not actionable," <u>Brown</u>, 2006 WL 623594 at *5, and there is no dispute that the

decision resulting in Plaintiff's loss of hours on that job was not anticipated at the time of the

transfer and was made by the client, Plaintiff has failed to demonstrate that the Ambac to

Morgan Stanley transfer constituted an adverse employment action.

      Plaintiff next cites as an adverse employment action the fact that two Caucasian

attorneys, Alanna Martin and Laura Ricciardi, were assigned to the Rabobank case in January

2010, and therefore billed more hours than Plaintiff in January and February of 2010.  Plaintiff

was assigned to the United Guaranty case in January of 2010.  It is undisputed that the lack of

work on the United Guaranty matter in January arose from a post-assignment delay in document

delivery.  The assignment, at the time it was made, thus did not constitute an adverse

employment action.

    Relying on her statistical proffer that her total number of hours worked in 2009

was exceeded in that year by the average total hours worked by members of the group of full-

time "non-African American" contract attorneys and that the "non-African American" average

exceeded that of African American contract employees by 230 hours in that year, Plaintiff argues

that the disparity (i.e., Plaintiff's receipt of less compensation than the "average" "non-African

American" contract attorney) is itself an adverse employment action.  Plaintiff also relies on the

disparity and underlying statistical calculations as proof of the causation element of her prima

facie case, asserting that her compensation level was the product of discriminatory assignment

decisions.  Plaintiff proffers no evidence regarding particular assignment decisions other than the

two discussed above, apparently assuming that the statistics suffice as both evidence of an

adverse employment action and the basis of an appropriate inference of discrimination, such that

the burden shifts to Quinn to proffer a legitimate non-discriminatory basis for every contract

attorney assignment decision in 2009 that Plaintiff may contend affected her, directly or

indirectly, in a negative manner.  Plaintiff misapprehends the role of statistical evidence in a

private, nonclass action, disparate treatment case under Title VII.

    In its July 2012 decision in Chin v. Port Authority of N.Y. & N.J., 685 F.3d 135

(2d Cir. 2012), the Second Circuit this year joined every other Circuit that has addressed the

question in holding that the "pattern or practice" method of establishing the existence of discrimination for prospective relief purposes in class actions is not available to individual private plaintiffs. Individual private plaintiffs must prove that they were, individually, the victims of intentional discrimination. Extending the "pattern or practice" method of proof to the nonclass action context would, as the Chin Court noted, "allow nonclass private plaintiffs who have shown a pattern or practice of discrimination . . . to shift the burden to employers to prove that they did not discriminate against a particular individual." Chin, 685 F.3d at 149. Such a shift would "conflict with the Supreme Court's oft-repeated holding in the context of disparate-treatment, private nonclass litigation that '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Id., quoting Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Plaintiff's attempt to establish the adverse employment action element of her prima facie case of intentional discrimination through statistical evidence constitutes precisely such an improper shifting of the burden of proof and must therefore be rejected. Plaintiff has not identified any specific assignment decisions, other than those already discussed, that she alleges were the product of intentional discrimination and caused her economic harm. She has thus failed to proffer evidence from which a fact finder could properly determine that she suffered an adverse employment action attributable to race-based disparate treatment, and Defendant is entitled as a matter of law to judgment dismissing her Title VII racial discrimination claim.[3]

---

[3]     Even if statistical evidence could be used to establish the adverse employment action prong of a disparate treatment claim, Plaintiff's response to Defendant's motion still falls short of an evidentiary proffer sufficient to raise a genuine issue of fact as to whether she was treated differently from relevant comparators as a result of Riegler's alleged racial bias. Plaintiff relies on statistics covering the entire year 2009 (although it is undisputed that Riegler was not appointed as Senior Discovery Attorney until September 2009 and staffed only two matters prior to his appointment) and lumps

Plaintiff's Title VII Retaliation Claim

Retaliation claims are evaluated under the same McDonnell Douglas burden-shifting framework as discrimination claims. Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010). In order to establish a prima facie case of retaliation, Plaintiff must show "(1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." Id. A plaintiff's burden is de minimis; the court must "determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010). Under these facts, Plaintiff may show that she has suffered an adverse employment action by prevailing on her claim of constructive discharge; she may also defeat Defendant's summary judgment motion by adducing sufficient evidence from which a reasonable fact finder could conclude that a reasonable employee would have been dissuaded by Quinn's actions from making a complaint of discrimination. Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

With respect to the first prong of Plaintiff's prima facie case, the record plainly shows that Plaintiff engaged in a protected activity by making a complaint to the firm about

---

together all "non-African American" attorneys, including Asian, Hispanic and "Other" individuals for her comparison average although her assertion is that Riegler favored Caucasian attorneys. Plaintiff also offers a group comparison for part of 2010, but these statistics suffer from the same lack of relevant comparator groups as the 2009 evidence. For the same reason, the statistical evidence is insufficient to raise an inference of discrimination when offered in conjunction with Plaintiff's alleged instances of discrete, allegedly adverse, employment actions.

racial discrimination by her supervisor.  Although Quinn claims that Plaintiff merely made a complaint of "favoritism," Calamari clearly understood Plaintiff's complaint to be based on racial discrimination, and accordingly commenced an investigation.

As to the second prong, Plaintiff asserts that she was constructively discharged when Defendant did not immediately grant her request that either she or Jennison be reassigned from the United Guaranty project.  "Constructive discharge occurs when the employer, rather than discharging [his employee] directly, intentionally creates a work environment so intolerable that the employee is forced to quit involuntarily," but it is not enough to show "that the working conditions were merely difficult or unpleasant."  Stroud v. New York City, 374 F. Supp. 2d 341, 350 (S.D.N.Y. 2005) (internal citation and quotations omitted).  Moreover, "[a]n employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge."  Cooper v. Wyeth Ayerst Lederle, 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000).

Plaintiff's proffer is wholly inadequate to raise a fact issue as to whether Quinn intentionally subjected her to an intolerable work environment.  She has introduced evidence of a personality conflict between co-workers, focused on a disagreement about scheduling.  Plaintiff's email complaint to Riegler centered on her conversation about scheduling issues with Jennison on July 14, 2010, and Jennison's general level of anger.  She did not personally witness any of the incidents in which Jennison allegedly yelled at other attorneys to which she refers in her email.  Working with Jennison was likely unpleasant for the Plaintiff, but it does not on this record rise to the level of objectively intolerable.  Riegler and Fogler responded promptly after Plaintiff's complaint about her interactions with Jennison, and the next day, July 21, 2010,

attempted to address Plaintiff's concerns within the constraints of Quinn's staffing situation.  In

the July 21, 2010, meeting, Plaintiff repeated these concerns, and stated that she did not want to

work with Jennison.  Plaintiff argues that she could have switched places with another attorney,

even if there were no open assignments.  However, she has not introduced any evidence to

contradict Riegler's statement that all of the contract attorneys were, at that time, working on

time-sensitive matters which would have been disrupted by a transfer, and that no alternative

placement was available.  Riegler could not immediately transfer Plaintiff, but it is undisputed

that he offered to help resolve the scheduling conflict by taking over responsibility for

scheduling.  Plaintiff tendered her resignation before this measure could be put in place, and

therefore, cannot claim constructive discharge.  Quinn is entitled to summary judgment to the

extent Plaintiff's claim is premised on constructive discharge.

   Plaintiff does not, however, have to demonstrate that she suffered a constructive

discharge to establish a <u>prima facie</u> retaliation claim.  A material adverse employment action in

the retaliation context is one which would deter a reasonable employee from making or

supporting a claim of discrimination.  <u>Burlington N. and Santa Fe Ry. Co.</u>, 548 U.S. at 68.

While "[a] retaliation plaintiff need not show that she . . . suffered economic harm, severe

humiliation, or threats of violence," <u>Spector v. Bd. of Trustees of Cmty. Tech Colleges</u>, 316 F.

App'x 18, 21 (2d Cir. 2009), it is necessary "to separate significant from trivial harms. . . . An

employee's decision to report discriminatory behavior cannot immunize that employee from

those petty slights or minor annoyances that often take place at work and that all employees

experience." <u>Burlington</u>, 548 U.S. at 68.  "Context matters," and so the Court must consider the

"particular circumstances" of the act.  <u>Id</u>. at 69.

   Plaintiff's evidentiary proffer is insufficient to meet this lower <u>Burlington</u>

"materially adverse" standard as well. Her account of the conflicts with Jennison and the undisputed record concerning Quinn's reaction to her complaint are insufficient, even when viewed in the light most favorable to Plaintiff, to frame a set of conditions under which a reasonable employee would be dissuaded from reporting an instance of discrimination.

The crux of Plaintiff's argument is that she feared for her physical safety when she was around Jennison. Evidence of an objectively dangerous situation can, in some circumstances, be sufficient for such a claim to survive summary judgment. See e.g., Hicks, 593 F.3d at 169-70 (when employee-plaintiff was transferred to a facility housing a troubled youth who had previously threatened violence against the plaintiff's family, and another employee-plaintiff was scheduled to work shifts alone in a facility when such a practice was known to be hazardous, the court found that these specific facts established that the situations were objectively dangerous). However, in contrast to the objectively dangerous situations in Hicks, Plaintiff here has not shown that her fear of Jennison was objectively reasonable, or that a reasonable employee would be dissuaded from reporting discrimination if her supervisors provided her with suggestions and formulated measures to ameliorate the situation in lieu of an immediate transfer. While she may have been uncomfortable when Jennison confronted her about his schedule, Plaintiff has proffered no evidence that Jennison was prone to violence or had a history of violent confrontations, other than her conclusory statements regarding hearsay allegations of verbal abuse by other workers. Although Jennison admitted to once banging on the desk of a sleeping attorney, this does not constitute evidence that he represented a danger to his co-workers. Furthermore, Riegler and Fogler showed a willingness to take practical steps to separate her from Jennison. Accordingly, Plaintiff has not established a prima facie case of retaliation, and Quinn is entitled as a matter of law to summary judgment dismissing Plaintiff's

Title VII retaliation claim in its entirety.

Plaintiff's State Law Claims

        Because the Court will dismiss all of Plaintiff's claims of which it has original jurisdiction, it declines to exercise supplemental jurisdiction over Plaintiff's claims under the New York State and New York City Human Rights Laws.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) (noting that "judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims" when federal-law claims are eliminated before trial); Kolari v. N.Y. Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (holding the exercise of supplemental jurisdiction inappropriate if federal law claims are dismissed before trial).

## CONCLUSION

        For the foregoing reasons, Defendant's motion for summary judgment is granted. This Memorandum Order resolves docket entry no. 17.  The Clerk of Court is requested to enter judgment in Defendant's favor and close this case.

        SO ORDERED.

Dated: New York, New York
      January 3, 2013

LAURA TAYLOR SWAIN
United States District Judge